Donald M. KEENE et al., Plaintiffs,

v.

ICE MACHINERY INDEPENDENT EM-
PLOYEES' ASSOCIATION and Irwin
Swartzbaugh et al., Defendants.

Civ. No. 71-267.

United States District Court,
M. D. Pennsylvania.

Sept. 24, 1971.

Ira H. Weinstock, Handler, Gerber & Widmer, Harrisburg, Pa., for plaintiffs.

Donald T. Puckett, York, Pa., for defendants.

### MEMORANDUM OPINION AND ORDER

HERMAN, District Judge.

Plaintiffs, five members of Ice Machinery Independent Employees' Association, hereinafter called "Union," and all of them delegates representing various units of the Union have brought this action against the Union and against Arthur Rider, Jr., Financial Secretary, James Raub, Treasurer, Irwin Swartzbaugh, Recording Secretary, and thirteen named delegates alleging [1] a violation of

---

1. The gravamen of the complaint is contained in paragraph 14 thereof:

"14. The rights and privileges of the Plaintiffs to nominate candidates, to vote in the Association, to attend membership and delegate meetings, to meet and assemble freely with other members, to participate in the deliberations and voting upon the business at such meetings and to participate in the removal from office of any officers who have violated any of the By-laws, have been infringed on and will continue to be infringed on as long as Lewis J. Bievenour and George McEachern are denied their right to serve as duly elected President and Vice President of the Association."

the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 et seq., more particularly §§ 411 and 412.

Section 411, known as the Bill of Rights for members of Labor organizations, provides, in relevant part:

"(a) (1) Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

"(2) Freedom of speech and assembly.—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations." (Emphasis in original)

The background of this intra-labor organization dispute is essential to an understanding of the matter before us.

The Ice Machinery Independent Employees' Association is an independent union composed of approximately 2,000 members, of which approximately 100 generally attend union meetings. Officers, consisting of a President, Vice President, Recording Secretary, Financial Secretary, and Treasurer, as well as delegates are elected at an "Election Poll" in November of each even-numbered year for a two-year term and serve until their successors "are duly elected, or until they have been removed from office according to other provisions" of the By-Laws.[2]

Section 1 of Article II of the Constitution and By-Laws provides that "The Association shall be governed, directed and represented by a Board, composed of the Officers of the Association, and a Board of Delegates not to exceed a total of forty (40)."

In November of 1970 an election was held and Lewis J. Bievenour was duly elected President; George C. McEachern

2. Article II, Section 1(A): "The officers of the Association shall be a President, a Vice-President, a Recording Secretary, a Financial Secretary and a Treasurer."

Article II, Section 3—Delegates: "There shall be one delegate to represent each Unit of members of the Association. Each Unit may be composed of one-hundred (100) or more members, unless otherwise specified by the Association. (The Units are set forth in Art. 4 hereof). The Delegate shall be employed in the Unit he is elected to represent, and only members of each Unit shall vote for the Delegate to represent their respective Unit."

Article II, Section 5—Nomination of Officers and Delegates: "Nominations of Officers and Delegates shall be made at the regular September meeting of each even year. Nominations shall be made only for members in good standing, and may be made by any member of the Association, excepting Delegates who must be nominated by members of their respective unit."

Article II, Section 6—Election of Officers and Delegates: "(A) Election of Officers and Delegates shall be conducted at an Election Poll, held in November of each even year. Such elections shall be by secret ballot. The nominee for each office receiving the highest number of votes cast, shall be declared elected to that office. * * *"

Article II, Section 7—Term of Office: "All Officers and Delegates shall serve for a term of two (2) years, or until their successors are duly elected, or until they have been removed from office according to other provisions of these By-Laws."

was duly elected Vice President; Irwin Swartzbaugh was duly elected Recording Secretary; Arthur Rider, Jr., was duly elected Financial Secretary; and James Raub was duly elected Treasurer.

Testimony reveals that at the 1970 election, 23 delegates were duly elected but the names of only 20 appear in the proceedings: John Piho; Marlyn Geesey; Joseph Hoffman; Donald Keene; Victor Zech; Willie L. Allen; Benton Senft II; Gerald Krebs; George Onley; Robert Wisner; Philip Reever; Roland Miller, Jr.; Ray Axe; Elmer Markel; Luther Geiselman; John Hess; D. C. Melhorn; Dean Rentzel; Thomas Harleman; Morgan Irwin.

These 5 officers and 20 delegates (with perhaps 3 other unnamed delegates) composed the governing board for the Union at the beginning of the unfortunate intra-union squabble which might have had its genesis in the selection of a general counsel.[3]

Although there are no minutes available, it is said that there was a special meeting of the Board of Delegates on February 5th at which the Board voted to suspend Swartzbaugh, Recording Secretary; Arthur Rider, Jr., Financial Secretary; and James Raub, Treasurer. It is further said that at a meeting or hearing on or about the 14th of February these officers were reinstated.

It is averred that on March 12th the Board of Delegates again met[4] and suspended these same three officers, and in addition suspended 13 delegates. It is

3. In November 1970 Joel Blackmon, Esq., from Washington, D. C. was the attorney for the Union and had been such attorney since 1954. At a membership meeting held on January 9, 1971 (counsel had regularly been appointed for a one-year term ending on January 11 of each year), a motion that "the services of Mr. Joel Blackmon be discontinued, effective as of today Jan. 9, 1971," was apparently defeated by a vote of 58 to 43. The minutes, however, reflect the action on this motion as "The vote was as Follow's [sic] 58 to *retain* Joel Blackmon and 43 to Discontinued [sic]. Motion carried." (Emphasis supplied) This action was variously interpreted by the members as (1) to retain Blackmon for one year until January 11, 1972, or (2) as merely refusing to discontinue his services on January 9, 1971. At a membership meeting on February 7, 1971 which Ira Weinstock, Esquire, attended, apparently by invitation, Weinstock was retained as attorney for the Union. Mr. Weinstock is the counsel for the plaintiffs in this action *against* the Union which he was apparently elected to represent; he is also counsel *for* the Union and Lewis J. Bievenour and George C. McEachern, Trustees ad litem against Irwin Swartzbaugh, Arthur Rider, Jr., and James Raub; 19 May 1971, York County Common Pleas, an equity action seeking possession of books and records of the Union; and on August 11, 1971, representing Bievenour and McEachern, he has filed a complaint with the Secretary of Labor of the United States under the Labor-Management Reporting and Disclosure Act of 1959. In plaintiffs' Exhibit 10 which purports to be the 3rd and last page of the minutes of a delegates' meeting of February 16, 1971, this paragraph appears: "A motion made by Ray Strausbaugh and seconded by L. Geiselman to have the president send to Ira Winestock [sic], to inform Joel Blackmon that they should get together and determined [sic] who is our Atty. Motion Carried."

To further complicate the counsel issue, a letter addressed to the employer, dated March 9, 1971, and signed by 17 persons, including 3 officers and 14 delegates, reads in toto:

"At the general meeting on January 9, 1971, we voted on, and agreed to retain Joel D. Blackmon as our I.M.I. E.A. Association Attorney for a period of one (1) year, on a yearly basis.

"We, the undersigned officers and delegates, do not recognize, or have any transactions with Ira H. Weinstock as being our attorney.

"We hereby wish to inform you to recognize only; Joel D. Blackmon as our only legal attorney."

4. Apparently there are no minutes of any such meeting, and in the record made before us in this case there is no testimony concerning the attendance at the meeting, how many delegates voted to suspend any of the accused officers or delegates, nor what charges were levied against any of them. Neither plaintiffs' Exhibit No. 9 which purports to be a carbon copy of the charge against Rider (dated March 16), nor defendants' Ex-

not clear whether such meeting was ever held, and if it was held, where it was held and what actually transpired. However, defendants' Exhibit 10 (Minutes) reveals that on March 26, 1971 the special meeting called by the notice (Defendants' Exhibit 9) was held and in attendance were the duly elected President and Vice President and the newly appointed Recording Secretary, Treasurer, and Financial Secretary. Thirteen delegates, only six of whom had been duly elected, were present as were seven others purportedly appointed by the President. The suspended officers and delegates failed to appear. Apparently no testimony was taken for or against the removal of the officers and delegates, the minutes showing merely that the charge against them was read[5]; that the President asked if anyone wanted to speak on behalf of any of them; a vote was taken, and all 13 delegates present including the plaintiffs in this suit voted to remove all of the accused officers and delegates.

Meanwhile, on or about the first day of March 1971, the 13 delegates and 3 officers, the named defendants in the present action, met with several other Union members[6] and drew up detailed charges against Lewis J. Bievenour, the President of the Union, and against George McEachern, the Vice President. Averring, in the case of the President, that he pursued a policy of "complete dictatorial tactics"; filed false and unfounded unfair labor practice charges against the company for his own personal and selfish promotions and without approval of the other officers or the delegates; established new units contrary to the Union Constitution and By-Laws, and then appointed delegates to represent such units; made false and malicious statements to the Press to the detriment of the Union; and in violation of the Labor-Management Reporting and Disclosure Act of 1959, suspended Swartzbaugh, Rider, and Raub, the officers defendants in this action, "in that the officers were given no written charges nor afforded a reasonable time to defend against such charges and were not given a full and fair hearing." (Defendants' Exhibit 1)

In the case of the Vice President the charges were that he, too, unlawfully assisted in the suspension of the three officers without written charges, proper notice, or hearing, and it was further charged that McEachern, the Vice President, while presiding over a special meeting of the membership on February 14, 1971 threatened bodily harm to several members who sought the floor to speak. (Defendants' Exhibit 2)

hibit No. 8 which purports to be a photostatic copy of a telegram addressed to James Raub notifying him that he was suspended as Treasurer under date of March 17, 1971, nor defendants' Exhibit No. 9 which purports to be a copy of a notice for a special meeting to be held on March 26, 1971 to hear charges against the three officers and 14 delegates, specifically sets forth what the charges are against the accused. Defendants' Exhibit No. 9, the notice of the hearing to be held on March 26, 1971, was probably not posted on bulletin boards of the employer—a proper method of giving notice as suggested by the Union's Constitution and By-Laws.

Defendants' Exhibit No. 8 (telegram) was apparently sent by 9 delegates, only *seven* of whom were duly elected delegates, the other two, Termini and Wile, having been appointed by the President.

5. "Mr. Donald Keene (Delegate) read the following charges that were brought

against each and every man separately. The charges were read as follows: I Donald M. Keene bring a charge against each and every man for Violation of the BY-LAWS, Covered under Article II Section 8:A. Any Officers or Delegates of the Association who shall violate any of the BY-LAWS or who shall endanger the general welfare of this Association, shall be suspended immediately by the Board of Delegates. If found guilty of such violation by a majority of the Board at a public hearing held after due notice to the accused Officers or Delegates such Officers or Delegates shall be removed and the office declared vacant. These men formed a committee on their own. They sent letters to management concerning Union matters which should have been brought out at a Union meeting instead of involveing [sic] management in Union business."

6. It is not clear if these 6 or any of them were also delegates.

These charges were in writing and signed by the 13 defendants and several others, and on March 16, 1971 at a regular meeting of the delegates and prior to the receipt of Defendants' Exhibit 8, (the telegram notifying the said defendants of the impending hearing on their removal) Irwin Swartzbaugh, the Recording Secretary, served the charges along with a notice that a public hearing would be had thereon on April 18th, by handing the papers to Bievenour and McEachern personally, or laying them on their desks in front of them at the meeting.

This brings us to the facts surrounding the meeting of April 18, 1971 where the alleged violation of the Labor-Management Reporting and Disclosure Act of 1959, which purportedly gave rise to this action, is said to have occurred.

On March 29, 1971 the 13 delegates and 3 officers who are said to have been removed on March 26, 1971[7] sought permission from management to post on bulletin boards throughout the plant a notice (Plaintiffs' Exhibit 1) of the hearing to be held on April 18th. This permission was granted and on April 9th the notices were posted.

A fair reading of the testimony shows that on April 18th about 100 persons including officers, delegates and Union members appeared at the meeting (hearing) and Swartzbaugh, Rider, and Raub were on the stage of the auditorium with Attorney Blackmon,[8] and Swartzbaugh and others appointed Rider, the Financial Secretary, chairman of the meeting. At this point Bievenour and McEachern came up to the stage and forcibly took the microphone from Rider and a chair from Blackmon and an argument began, and utter confusion resulted. The Mayor tried to get order and Swartzbaugh, Rider, and Raub, and many (perhaps close to half) of the assembled delegates and members left the stage and went at the suggestion of the Mayor to a foyer just outside the auditorium and separated therefrom by only an open doorway. In the foyer this group which may have numbered 50 held their hearing, and according to the minutes (Defendants' Exhibit 3) the aforementioned charges were read, testimony was heard and a vote taken. The 3 officers and 13 delegates, the within defendants, were among those present and 4 or 5 persons testified. Bievenour and McEachern remained with approximately 60 members and delegates in the main auditorium and took no part in the meeting in the foyer.

All of the plaintiffs were present in the auditorium but none of them followed the 50-odd who went to the foyer. John Piho, one of the plaintiffs, did not testify at either of the hearings in this court on the matter but the other 4 plaintiffs did and the best that can be said for their testimony is that, if believed, they were deprived of their right *as delegates* to vote on the motions to remove the President and Vice President at a hearing which they deny occurred, or if it did occur, was illegal or completely without any validity at all.

This court has jurisdiction of the matter under the Labor-Management Reporting and Disclosure Act, 73 Stat. 519, 29 U.S.C. § 401 et seq. (1959), as amended, and the complaint sets forth the jurisdictional requisites. "[T]he well established * * * practice * * * has been that the assertion of a substantial claim under a federal statute gives a United States court jurisdiction of that claim even though that court may determine ultimately that no cause of action on which relief could have been granted was alleged. * * *" Sheridan v. United Bhd. of Carpenters, etc., 306 F.2d 152, 156 (3d Cir. 1962); Lewis v. Amer-

---

7. Actually, there had been 14 delegates involved in the purported suspension and removal, but one of them, Benton Senft II, resigned at some point in the proceedings. We make no determination of the legality of these proceedings for in view of the conclusion we reach such determination is not necessary. However, we might note that if the said proceeding were legal, then plaintiffs would have no case here at all.

8. The Mayor of York and several Borough policemen were also there to help maintain order.

ican Fed. of State, County & Mun. Emp., 407 F.2d 1185 (3d Cir. 1969) n. 3; Axelrod v. Stoltz, 391 F.2d 549 (3d Cir. 1968); Depew v. Edmiston, 386 F.2d 710 (3d Cir. 1967). However, it has been held in this Circuit that "This title [Title I of the Act], captioned 'Bill of Rights of Members of Labor Organizations', and particularly Section 101, are designed to protect the rights of union members. The rights are repeatedly described as the rights of 'any member' or 'every member'. No mention is made of the rights of union officers or employees. It is of particular interest to note that the right-to-sue provision of the bill that was originally passed by the Senate provided that a labor organization shall not limit 'the right of any member *or officer* thereof to institute an action in any court. * * *' (emphasis added). The corresponding provision of the bill that was subsequently passed by the House did not contain the word 'officer'. In commenting on this difference between the Senate and House bills, a document prepared by Senator Goldwater's staff and inserted at his request in the Congressional Record states that 'the Senate bill extends protection of the right to sue expressly to union officers.' 105 Cong.Rec. 16487 (1959). The Conference Committee adopted the House version, and accordingly Section 101(a)(4) as finally enacted by Congress speaks only of the right of *members,* thus conforming to the terminology used in the other provisions of Section 101." Sheridan v. United Bhd. of Carpenters, *supra,* 306 F.2d at 156–157 (Emphasis in original); *See also,* Lewis v. American Fed. of State, County & Mun.Emp., *supra.*

■ It seems to us that if plaintiffs' concern is really to protect or redress rights in themselves, then the rights they seek to protect are rights as *delegates* and not rights as members of the Union. Article III, Section 8(A)[9] of the Constitution and By-Laws provides a manner for the removal of officers of the Union *by the delegates.* And it is the purported removal of the President and Vice President about which they complain. But even if a breach of this alleged right is actionable under the Labor-Management Reporting and Disclosure Act, we must conclude that plaintiffs have not met their burden of proof that such a right was violated.

They were all present at the meeting in the auditorium when nearly half of those in attendance, after the fracas described previously, including, of course, those who called the meeting, or hearing, went in a body to the foyer. Plaintiffs were at perfect liberty to follow and to take part in any proceedings conducted there. The court is convinced that they elected not to go and take part in what they describe as an illegal assembly.

While we make no determination on the legality of this meeting, or hearing, we note that Borg-Warner, the employer, and National Central Bank, the depository of the Union funds, recognized the validity of the action taken at that meeting which removed both the President and Vice President from office.[10]

■ After a careful consideration of the evidence taken at two hearings in this matter, and an examination of all the exhibits, we conclude that plaintiffs are not really complaining about any deprivation of their individual rights but are actually complaining about purported rights of Bievenour and McEachern and this they cannot do for a plaintiff has no standing to enforce the rights of others. Mamula v. United Steelworkers of America, 304 F.2d 108, 113 (3d Cir. 1962), citing other cases; Johnson v. Steven-

9. "Any Officer of the Association who shall violate any of the By-Laws or who shall endanger the general welfare of this Association, shall be suspended immediately by the Board of Delegates. If found guilty of such violation by a majority of the Board at a public hearing held after due notice to the accused Officer, such Officer shall be removed and the office declared vacant."

10. Apparently the membership of the Union recognized the removal of the officers too, for on August 13, 1971 an election was held and a new and different President and Vice President were elected.

son, 170 F.2d 108 (5th Cir. 1948), cert. denied, 336 U.S. 904, 69 S.Ct. 491, 93 L.Ed. 1069.

As previously noted, it has been brought to our attention since the hearing in this matter that in an election held on August 13, 1971, in which Bievenour was a candidate for the presidency of the Union, one Van Abel was elected with 622 votes and Bievenour polled 528, and for Vice President James Moul was elected with a vote of 520. Neither of these two officers are parties in this suit.

Two days before the election Bievenour and McEachern, through their attorney, filed a complaint with the Secretary of Labor, and under Title IV, 29 U.S.C. § 482 this appears to be the proper procedure to contest an election once it has been held.

In the light of what we have said here, we conclude that the plaintiffs have not met their burden of proof and have failed to prove a violation of the Labor-Management Reporting and Disclosure Act of 1959 and that the complaint should be dismissed, and the permanent injunction denied. We will enter an order accordingly.